## Elizabeth A. Ford *vs.* James M. Ford.

On a trial by jury of a libel for divorce for the cause of extreme cruelty, specified as consisting in blows inflicted on the libellant by the libellee upon a single occasion, evidence of similar acts of the libellee on other occasions is inadmissible to establish an independent ground of divorce; and it is within the discretion of the judge to exclude it also, if offered to show the disposition of the libellee on the occasion in question, or if attempted to be elicited on cross-examination of the libellee as a witness.

On the trial of a libel for divorce, a daughter of the parties was a witness for the libellant, and the libellee introduced evidence of remarks which she had made about him, for the purpose of showing that she testified under bias. *Held,* that evidence, offered by the libellant, to prove that the libellee had struck the witness before she made the remarks, was inadmissible.

The exclusion of remarks made by a witness, offered for the purpose of showing that he has testified under bias, without stating the nature of the remarks, is not ground of exception.

On the trial of a libel for divorce, in which the libellee has introduced evidence tending to show that the acts relied on to sustain the libel were induced by the libellant for the purpose of getting cause for a divorce, it is inadmissible for the libellant to prove, in refutation of this theory and as evidence of her intention, an unanswered letter subsequently written by her to the libellee, recounting her accusations against him and proposing terms for a separation.

A refusal to allow an amendment of the libel on a trial for divorce is not subject to exception.

To sustain a libel for divorce for the cause of extreme cruelty, there must be evidence of personal violence, intentionally inflicted, of such a character as to endanger the life, limb or health of the libellee or create reasonable apprehension of such danger.

Libel filed October 13, 1868, for a divorce from bed and board, the libellant alleging for cause, that the libellee had " been guilty of extreme cruelty towards her, and particularly on the 23d day of September last inflicted upon her person blows, and then and there did divers other acts of extreme cruelty, to her great injury." The answer denied that the libellee had ever been undutiful of his marriage vows or obligations, or ever treated the libellant unkindly in any manner whatever either by word or deed; and alleged that, on the contrary, he

had ever conducted himself in a kind, affectionate and gentle manner towards her.   Trial by a jury, before *Morton.* J., who made the following report thereof :

" The parties have been married some thirty years, and have resided in Boston during that time, living together in a house belonging to the libellant, or standing in her name, for the last twelve years, their family at home consisting of themselves, two daughters unmarried, aged eighteen and twenty-three years respectively, and a son aged thirteen years.   The defendant is a jeweller ; and the parties belong to the higher stations of life.

" The evidence of the libellant, coming from herself and the children, tended to prove, and was to the effect, in substance, and her counsel contended from her own evidence and that of the libellee himself upon the whole case, that the libellee on September 23, 1868, without provocation or justification, used cruel, abusive and threatening language toward her, and also inflicted blows and personal violence upon her person, in her own house and in the presence of the children.   The occasion and substance of what she contended occurred was this : On the day named, the parties were in the front room, up stairs, in the house ; he was about to clean a flue of a chimney, and was going to use for that purpose a brush of hers, and she objected to his using it; he thereupon flew into a passion, and began using abusive and violent language toward her ; she said that she was too old to be talked to in that way, and left him with a view of going into the next room adjoining ; he threatened her, that, if she shut the door, he would break it down, and that he would break every door in the house ; she went into the next room and he followed her, continuing his use of abusive language ; Elizabeth, their older daughter, came into the room, attracted by the noise, and remonstrated against his abusing her mother so, taking her mother from the back part of the room where she was standing and leading her forward, whereupon he stepped up and said to the daughter, ' I have wrung your nose before and I will do it again,' lifting up his left hand at the same time as if about to do so ; the libellant raised up her left hand, in which she held a cap of her son, and put it between

his hand and the daughter's face to prevent the act; he there-upon dropped his left hand and immediately struck the libellant with his right hand and fist, knocking her down upon the floor. in the presence of said older daughter and said son; the other daughter then came into the room, from up stairs, hearing the noise, and in course of a conversation, upon her inquiry as to what occurred, and upon the older daughter saying that he had knocked her mother down, the libellee denied it and said if she said so again he would knock her down with the hammer; he took up the hammer and threatened to throw it at her; the chil-dren took the libellant into the other room ; the libellee followed them, and kept going in and out at intervals, and continued the use of his abusive language toward the libellant; he there also struck a glass globe-shade with his fist, aiming at her, and knocking it in pieces with such violence that a piece of the glass flew across the room and hit her in the head, cutting it and drawing blood ; and he also took up a vase, and was ap-parently in the act of throwing that, but desisted upon some remark or act of one of the daughters.

" The evidence of the libellant was, in substance and effect, that the language and manner of the libellee were very violent and abusive, and were kept up during all of said time ; that he said that the libellant was a born fiend, an infernal devil ; called ler, in derision, the beautiful Mrs. Ford, the Miss Kingsbury that was ; swore and used profane language towards her ; said he hated her ; had been cursing her for a half-hour; talked to her violently and harshly ; tantalized her about money ; said all she wanted was 'money, money, money,' that she should not have a cent thereafter except what she wanted or needed for drink, and that she was all wrapped up in her own virtue ; and when the daughter Elizabeth said to the other daughter, upon her coming into the room and inquiring what had happened, that the libellee had knocked her mother down, he first denied it, then admitted it, and said he would do it again ; and when he struck the shade, he said he would give her all the staying out nights and smashing of crockery which she wanted, and then struck ì as before stated ; that he ordered the said older daughter to leave

the house, and told the other to be careful how she made her bed, for as she made it so she must lie ; that he himself left the house that night and did not return ; and that the parties have not lived together since.

" The libellee gave a different version of the affair, stating, in substance, that he was provoked by the conduct and language of the libellant, and in a passion by reason of it ; that he was also defied and called a coward by his daughter Elizabeth, and rushed towards her to put her out of the room ; that the libellant came in between them, and against him, and went over ; that he did not strike her, and his pushing her down, and his hitting and breaking the glass shade, were not intentional, but accidental ; that he did swear and use profane language toward the libellant at the time ; that he then recounted to her sundry charges of her previous misconduct, stating among other things that she had attempted to poison him, that one of his said daughters was no better than a common prostitute, that he had so stated and he knew it and could prove it, that the libellant had got his house and furniture and had turned her friends against him in order to put him down, and that her own crimes would come out. The libellee offered no proof of any previous misconduct or ill treatment on the part of his wife, save his own statements to her on said occasion in charging the same.

" The libellant offered evidence of previous similar ill treatment and misconduct of the libellee towards her on other occasions, as proof of the charges made against him, and as grounds of divorce, in connection with what was specifically alleged and proved ; claiming that it was competent under the libel as drawn, for that purpose, or, if not, that it was competent as tending to show the *animus* and the hostile state of feeling on the part of the libellee, and as affecting his conduct in evidence on the particular day named, and that this conduct was not exceptional, and did not stand as an isolated instance, but was a repetition and a continuation of other similar bad conduct. But the judge excluded the evidence, as incompetent, under the pleadings, for any purpose.

Ford *v.* Ford.

" The daughter Elizabeth was a witness for the libellant, and testified to the conduct of the libellee on the particular occasion named and referred to. The libellee was allowed to introduce evidence, against the libellant's objection, that the witness, at different times, prior to said occurrence, had stated that she hated her father, or despised him; that she wanted to keep on the right side of her father so she could get money out of him; that he was a bad man, capable of doing anything, and ought to be hung; and also that the libellant, when the libellee was abroad, expressed a wish that he might be killed, and that she would be better off if he was dead, and stated what amount of property she would have in that event. The libellee also put in evidence tending to show that the libellant had represented that she had been trying to get rid of him for ten years, and been seeking some cause for divorce. There was no evidence that these statements, if made, were ever repeated to the libellee by the third parties to whom they were claimed to have been made. The evidence was offered and admitted as tending to show bias, and as affecting the credibility of the witnesses. The libellant offered to show that the libellee had previously knocked Elizabeth down and wrung her nose; but the judge excluded the evidence.

" John Ayling testified, for the libellee, to conversations in contradiction of the son of the parties, who had testified for the libellant. Ayling testified, in cross-examination, that he was equally the friend of both parties. The libellant offered in evidence a conversation of Ayling with her daughter Elizabeth, held after said occurrence, and his statement made in reference to the affair and the parties, no statement of what the conversation was being made in the offer; but the libellant claimed that it would show his bias and feeling against her, and in favor of the libellee. The judge excluded the evidence.

" The libellant offered to show, in the cross-examination of the libellee, that he had struck the libellant before, and wrung the nose of his daughter Elizabeth and knocked her down; and asked him whether he had not done so. But the judge excluded the question and evidence.

Ford *v.* Ford.

" The libellee offered evidence tending to show, as he contended, that the libellant had been endeavoring, before, to get some grounds on which to found a claim for a divorce, and that the occasion in question had been induced by her for that purpose and the facts misrepresented or exaggerated by her. The libellant denied this, and offered in evidence, in refutation of this theory, and as evidence of her intention, a letter from her to the libellee, dated September 28, 1868, (after the separation of the parties,) which was produced by the libellee at the trial, on notice, and is copied in the margin.* The libellant contended that,

---

* " Boston, Sept. 29, 1868.  My Own Husband : With a heart full of the deepest anguish, I now undertake the most difficult task of my life.  For nearly thirty-one years we have lived together in the bonds of marriage.  No one knows so well as yourself whether I have faithfully fulfilled those vows with which our young hearts and lives were bound together.  I have taken this method of communicating with you, because I very well knew that any attempt on my part to have a verbal interview would only result in bitter recriminations and bursts of anger.  After days of serious reflection, I have concluded to adopt my present course ; and believe me that I am firm, when I tell you that the time has come when we must separate.  You very well know that I have sufficient grounds for divorce ; but unless I am obliged to, I shall not attempt to get a divorce, because I would wish to spare you as well as our dear children the disgrace which would come by making such evidence public. What I would like would be, for you to follow your often expressed wish of going into business in another city, which is not an uncommon thing for a merchant to do ; then the public need not know of our domestic troubles, and I would have some heart to take care of my little family, if I was not in constant fear of these terrible scenes at home.  In regard to the final settlement, I would suggest that I am willing to leave it to three referees — you choose your best friend, I will do the same, and let them in their turn choose the third one ; and, if you are willing, I also will submit to their decision.  Do not think me too hasty, for I have been looking back for the long period of twenty-two years that we have occupied our two last homes, almost every room of which is filled with the memory of some sad domestic scene, from the time when, nineteen years ago, I got on my knees and begged of you to treat me differently, for the sake of our unborn babe, (our sweet little Abby,) and you spurned me from you, until the events of the last two weeks, when you have not only knocked me down, but have also brutally knocked down our other daughter and wrung her nose, in two instances, for no other reason than that she could not stand by and see her mother abused without protecting her.  Now I have arrived at an age when I can no longer bear up under such treatment ; and I now appeal to

Ford *v.* Ford.

if the whole of this letter was not admissible, portions were, for said purpose; but the judge excluded it.

" The libellant contended that the charge of cruel and abusive treatment was open to her under the libel as it stood, but in course of the trial, and after the evidence was in, offered, for safety, to amend, by adding the words, ' cruel and abusive treatment,' to the allegations of the libel, but introducing no other evidence upon the point. The judge declined to permit it, the libellant claiming a right to except and excepting.

" The libellant's counsel contended that it was sufficient if the conduct of the libellee was such as would cause injury to life, limb or health, or create a danger of such injury, or a reasonable apprehension of such danger upon the parties continuing to live together; or that mere words were sufficient, if they created a reasonable apprehension of personal violence, or tended to wound the feelings to such a degree as to affect the health of the party, or create a reasonable apprehension that it might be affected; or such causes as would produce deeply wounded sensibility and wretchedness of mind. The judge declined so to rule; and ruled that the libellant could prevail only on the ground of extreme cruelty; that any acts of personal violence of such a character as to endanger the life, limb or health, or as to create a reasonable apprehension of such danger, if intentional, constitute extreme cruelty; and that words and abusive language were not sufficient, but there must be personal violence, intentionally inflicted.

---

you in the name of the few bright spots in our lives; in the name of our own dear daughters, just coming into active life and whose few short years have been so full of trouble; also in the name of our first-born son for whose defence you have caused me so much unhappiness these few past years; also for our own dear little Jimmy, who bears your name and who is such a kind and affectionate little child; also for the sake of our dear little grandchildren; to put an end to all this trouble. They are young and easily impressed, and it is not right that their hearts should be embittered in this manner; but leave them now in peace, and as we after death remember only the good which our friends have done, so may they, as well as myself, endeavor to look at the sunshine rather than the darkness with which our lives have been surrounded. That God may guide us in the future is the most sincere wish of your wife."

" The jury returned a verdict for the libellee; the libellant excepted; and the case is reported for the determination of the full court. If any of the above rulings are erroneous, there is to be a new trial; otherwise the libel is to be dismissed."

*A. A. Ranney*, for the libellant.

*G. A. Somerby*, for the libellee.

CHAPMAN, C. J. The libel alleges that the libellee " has been guilty of extreme cruelty towards her, (the libellant,) and particularly on the 23d day of September last inflicted upon her person blows, and then and there did divers other acts of extreme cruelty, to her great injury." In the ordinary language of pleading, this amounts to a specification of the infliction of blows, on a single occasion, under such circumstances and in such a manner as to constitute extreme cruelty. The parties went to trial before the jury upon this allegation and its denial; and the libellant was permitted to offer evidence of the infliction of blows on a single day, and of all the circumstances that occurred on that day, relating as well to the temper, language and manner of the libellee, as to the infliction of the blows. But evidence of previous similar, independent instances of ill treatment and misconduct on other occasions was properly excluded as an independent ground of divorce, because it was not pertinent to the issue which the libellant had chosen to offer by her allegations. The cause could not be tried upon allegations not made. It would not be in conformity with the rules of pleading, nor just to the libellee, who was entitled to have the matters relied upon set forth, at least by some general allegations, so that he could be prepared to meet them. If the allegations had been general, he might have moved for specifications, if necessary but as the allegations were limited to a single specified act, he needed no further specifications, and was bound to meet merely that charge. As tending to show the *animus* and the ostile state of feeling on the part of the libellee, and as affecting his conduct in evidence on the particular day named, we think the judge had discretionary power to exclude it. Apparently the proof of previous similar ill treatment and misconduct, in instances not alleged might be very prejudicial to the

libellee, without giving him any opportunity to be prepared to meet it.

As the daughter Elizabeth had testified against the libellee, he had a right to prove that she testified under a bias, by proving what remarks she had made about him. *Day* v. *Stickney,* 14 Allen, 255. But proof that he had previously committed an assault and battery upon her would not tend to disprove the bias, and would merely introduce a collateral matter not pertinent to the issue. Such evidence was properly excluded.

As to what Ayling had said, the presiding judge had a right to know what the party proposed to prove, in order that he might judge of its pertinency; and such statement not being made, he properly excluded the evidence.

How far cross-examinations shall be extended into collateral matters depends so much upon the special circumstances of each case that a large discretion must be intrusted to the presiding judge. The cross-examination of the libellee must be like that of any other witness in this respect. The limitation of the cross-examination of the libellee in this case was of this character, as it related merely to collateral matters; and we cannot say it was erroneous.

The letter written by the libellant to the libellee after their separation, consisting, as it did, of her accusations against him, and of a proposition to agree on terms for a final separation, could not be evidence for her. It was inadmissible, upon the plainest principles of law.

The motion to amend was addressed to the discretion of the presiding judge, and his decision was not subject to exception.

The instructions to the jury were right. The question before them was, whether the libellee had inflicted blows upon the libellant, on a single occasion, which were such as to constitute extreme cruelty. The instruction that there must be personal violence, intentionally inflicted, and that it must be of such a character as to endanger the life, limb or health, or as to create a reasonable apprehension of such danger, was correct. Th jury have found that there was no such violence.

*Libel dismissed.*